[Crim. No. 7895.   Second Dist., Div. Three.   Dec. 7, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES MONROE RUDOLPH, Defendant and Appellant.

James Monroe Rudolph, in pro. per., for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

THE COURT.—By one information James Monroe Rudolph was accused of assault with intent to commit murder, a second offense of burglary and a third offense of robbery, consisting of taking from the immediate presence of George C. Peterzon and James Stokes certain keys, by means of force and fear. By separate information, he was accused of grand theft. In each information he was accused of having served terms in prison after conviction of robbery, false imprisonment and kidnaping for the purpose of robbery and for a separate offense of robbery. The two informations were consolidated for trial. Defendant pleaded not guilty and admitted having served a term in prison for robbery, false imprisonment and kidnaping for the purpose of robbery and a separate term after conviction of robbery. In a jury trial defendant was represented by the public defender. By separate verdicts defendant was found guilty of assault with a deadly weapon, burglary and robbery and it was found that at the time of the burglary and at the time of the robbery defendant was armed. He made a motion for new trial, which was granted with respect to the conviction of burglary and denied as to the convictions of assault with a deadly weapon and robbery. The count charging burglary was dismissed. In propria persona, defendant appealed from the judgment and the order denying his motion for a new trial. He applied for appointment of counsel on the appeal; we denied the application after reading the record and determining that the appeal is groundless as to one conviction and clearly meritorious as to the other, as will hereinafter appear. Defendant was given notice, and time to file a brief and has filed none.

We have examined the instructions that were given and those that were refused and find that the jury was correctly and adequately instructed. In reply to our inquiry of the deputy public defender who represented defendant, we have been advised that there were no improper statements made by the district attorney in arguments to the jury.

There was evidence of the following facts. On December 5, 1960, the Scandia Restaurant at 9040 Sunset Boulevard in Los Angeles, was closed for business. At about 2:15 p. m., George C. Peterzon, executive chef, entered the restaurant

through a cellar door and admitted another employee, James Stokes, a pot washer. They went into Peterzon's office. Both Peterzon and Stokes testified that they observed a man coming down the stairway toward the office. The man was wearing a hat and his face was partly covered by a handkerchief. When he was about 10 feet away from them he pointed a gun at them. Peterzon stopped back into the office and closed the door. Stokes testified that the man told Peterzon to open the door or he would shoot him (Stokes); Peterzon opened the door and Stokes stepped inside; Peterzon asked, ''What do you want?'' and the man said ''Stay still or I will shoot,'' whereupon he fired a shot. He ordered them to lie on the floor and they both lay face down. The man asked where the safe was and was told there was no safe in the office; he asked where the money was, saying, ''There got to be some money around here''; he was told that the money was banked every night. The man looked around, pulled cabinets open, and pulled loose the telephone wires; he found some keys which he handled. He disappeared up the stairs, but returned soon and looked around some more, after which he left and did not return. After waiting some time, Peterzon and Stokes got off the floor. Peterzon then observed for the first time blood on his clothing and discovered that he had been shot in the leg. Peterzon got into his car and drove to the sheriff's office.

Harold Vincent Hall, a police officer, testified that at about 1:50 a. m. on the morning of December 10, he and his partner were alerted by a silent burglary alarm coming from 3359 Wilshire Boulevard. They went to the location; Hall's partner remained at the front of the establishment; Hall went to the rear driveway; Hall heard two shots and running around the corner saw his partner had just fired two shots at a man running across the street and between two houses; pursuing him he overtook him in a nearby garage where he was found hiding against the wall; he was arrested; a flashlight and a screwdriver were taken from him. The suspect wrestled his right arm free as the officers were placing on handcuffs, grabbed his gun and fired a shot, which went through his foot. A revolver was taken from him. The gun was produced at the trial and was admitted by defendant to be one that he had purchased from an ex-convict in Sacramento for $20 or $25.

Robert E. Carroll, a deputy sheriff, testified that a bullet that was shown him in court had been retrieved from the floor in

the lower kitchen of the Scandia Restaurant about 3:30 p. m. on December 5. It was photographed while held in his hand, was taken to the station and placed in the evidence locker.

Howard F. Gavin, an expert in forensic ballistics, testified that he fired seven shots from the gun that had been taken from defendant. Three of the bullets were compared with the bullet that had been retrieved by Deputy Carroll. They had all been fired from the same gun. Under examination and cross-examination he demonstrated that the identity of the bullets was proven by the striation pattern which fell into line and was similar in all respects. There was no other expert evidence on this subject.

Defendant testified that when he bought the gun, in September, it contained six loads, one of which was fired accidentally during his arrest. He denied having ever been in the Scandia Restaurant and any knowledge of any offense committed there.

Both Peterzon and Stokes were shown photographs of arrestees and later looked at several of them in a police line-up. Peterzon could not identify the defendant; Stokes testified that he did pick out the defendant as the one whom he encountered in the restaurant. Defendant testified that at that time while he could not see Stokes he heard him say ''I have never seen any of those men before.'' In his cross-examination defendant admitted three former felony convictions.

At the time of defendant's motion for a new trial and a hearing on an application for probation it was stated by defendant's attorney that defendant was presently serving a sentence of life imprisonment for a violation of section 209, Penal Code. Defendant was sentenced on his convictions of assault with a deadly weapon and robbery, the latter offense consisting of the alleged taking of keys from Peterzon and Stokes and from their immediate presence.

In the line-up at the jail Peterzon was unable to identify the defendant. The testimony of Stokes as to his identification was unconvincing. He apparently had no opportunity to observe the features of defendant during the commission of the offense. However, the expert testimony left no doubt as to the identity of defendant as the one who committed the assault.

Mr. Gavin was shown by study and experience to be well qualified as an expert in forensic ballistics. He had testified as such in cases running into the hundreds. He testified as follows: ''When the rifling grooves are cut into a weapon, the tooling of this rifling causes minute lines or striae, which

is unique to that particular weapon which is being worked on, because the tool itself receives wear, and there is differences in the metal in which the rifling is being cut, and this makes the pattern for that particular barrel to be unique and like no other barrel.'' In his experience he had never found two guns with the same striation patterns. The bullets which he had compared were received in evidence. He was subjected to vigorous cross-examination. The conclusions he expressed were convincing evidence that the bullet which struck Peterzon was fired from defendant's gun, which he stated had never been in the possession of any one else while he owned it. His guilt of assault with a deadly weapon was proved by the strongest sort of evidence.

■ We are of the opinion, however, that there was insufficient evidence to prove that defendant was guilty of robbery in taking keys from the immediate presence of Peterzon and Stokes as alleged in the information.

Peterzon testified as follows: ''Q. After the man came in the second time, what did he do after he was in there for awhile? I believe you stated he took some keys? A. The first time he took the keys to go upstairs to get in—I understand he had been up—— Mr. CRIGGER: (interrupting) I move to strike what he planned to do. THE COURT: Strike it out. Q. by MR. BAIN: Did you see him take the keys? A. I heard him take the keys. Q. Did you see where they were later on? A. No. Q. Later on, did you look at the spot where the keys had been? Did you notice later that some keys were missing? A. I don't know if they were missing. I heard him have them in his hand, about three or four of them.'' On cross-examination, he testified: ''Q. Did you actually see, with your eyes, any keys being taken by that man? A. No, but the keys are hanging on a rack, and you can hear it. Q. In other words, you didn't see any keys being taken, but you heard a noise which to you sounded like keys rattling, is that right? A. Yes, sir. Q. How many keys do they have on the place where the keys were taken from? A. Approximately 30-40. Q. And you did not find any keys missing sometime later? A. I didn't look for it. Q. You don't know, do you, whether the man, when he came in, had any keys with him in his possession, when he came to the stairway? A. No. All he had was a handkerchief in one hand and a gun in the other. . . . Q. After this happened, you didn't check the keyboard, or whatever it was, to see whether there were any missing? A. No, I went right down to the Sheriff's station. . . . Q. And the keys which you heard

rattling, or the noise that sounded to you like keys, did that happen right after you went into the office and laid down? A. No, it was after he looked around, and I suppose he saw the keys hanging on the rack, and he started fooling around with them to find something. . . . Q. When he left the office, did you check the keys? A. No, I couldn't check the keys. He took the keys and went out of the office and came back in again.''

Stokes testified: ''Q. Before he left the first time, did he take something with him? A. Yes, he took some keys. Q. Did you see him take the keys? A. No, I know they were rattling—— Q. What? A. The keys were rattling. . . . Q. After you laid down on your stomach in the office, did you look at him at any time then while you were lying there? A. No, I didn't. Q. Did you ever see that man take any keys from that office? A. All I heard was the rattling from the keys. Q. Just the rattling noise that indicated to you some keys were being moved by somebody? A. Yes.''

Whatever Peterzon and Stokes heard which they identified as the rattling of keys was while they were lying face down on the floor. At no time did they see defendant or observe his movements. While they assumed that he left the room carrying some of the keys, that was merely a conclusion from the fact that they heard what they believed to be the rattling of the keys. They merely supposed that he took the keys with him when he left the room. There was no evidence that any doors had been opened by the use of keys nor was there any evidence that any keys were missing. It was unlikely that if defendant took any keys from the board he would have returned them. However strong the suspicion may be that defendant carried away keys from the immediate presence of Peterzon and Stokes, the facts in evidence fall short of proof that he was guilty of robbery.

The judgment and motion for new trial with respect to the conviction of assault with a deadly weapon are affirmed; as to count III of the information charging robbery, the judgment and order are reversed.